MRS. MINOLA LAMBUTH VALLEY, et al. v. W. E. LAMBUTH.

Western Section, October 24, 1925.

Certiorari denied by Supreme Court January 30, 1926.

1. Pleading. Dismissal of original bill after filing of cross-bill asking affirmative relief does not dismiss entire proceedings.

In an action to try title to land where plaintiff dismissed bill after defendant filed a cross-bill asking affirmative relief, held the dismissal of the original bill after the filing of the cross-bill did not operate to dismiss the entire proceedings, but the cross-bill remained and the issues presented in the cross-bill were within the jurisdiction of the chancery court.

2. Courts. Jurisdiction. As between courts of competent jurisdiction, the first acquiring jurisdiction of the subject-matter of an action is permitted to retain it to the end.

In a suit to try title where plaintiffs first filed suit in a state court and then after defendant had filed a cross-bill asking for affirmative relief plaintiffs dismissed their bill and filed same suit in Federal court, held the State court having first taken jurisdiction of the case retained it.

3. Continuance. Discretionary with trial court.

The question of allowing or disallowing an application for a continuance addresses itself to the sound discretion of the chancellor, after an examination of the record and the status of the cause at the time the application for a continuance was made.

4. Bastards. Evidence. Judgment obtained in a suit involving different parties and subject-matter not admissible to prove legitimacy of child.

In an action to try title the record of another case in another state involving different land and different parties held not admissible to prove child's legitimation for it is not res adjudicata of the question.

5. Judgments. Res adjudicata.

In order to plead res adjudicata to a pending suit it must appear that the former judgment relied upon as res adjudicata, or estoppel by judgment, is by the same parties and on the some subject-matter as well as a final judgment.

6. Bastards. Person legitimated under the laws of state of his domicile will be considered legitimated in Tennessee and entitled to inherit under law of descent.

In an action by an illegitimate child claiming title to land by inheritance from his father and claiming to have been legitimated under laws of Arkansas and therefore entitled to inherit under laws of Tennessee, held a person having inheritable blood in another State of the Union is entitled to inherit under the law of descent in Tennessee, especially where there is no conflict in the law of descent.

7. **Bastards. Evidence. Evidence held not to show father of plaintiff was illegitimate child of owner of land involved.**

In an action to try title to land claiming as children of a deceased illegitimate child, evidence, held to show that plaintiff's father was not the child of the owner of the land.

8. **Bastards. Evidence. Evidence held not to make a question for the jury.**

In an action to try title to land claiming as children of a deceased illegitimate child, held that the evidence did not make a question for the jury and there was no error in court discharging the jury.

9. **Limitations. Co-tenant barred by limitations where there is actual ouster.**

·An actual ouster must be clearly established in order to give effect to the Statute of Limitations in favor of one tenant in common against another but held that the holding of a co-tenant, openly, notoriously, exclusively, and exercising all rights of ownership, by cultivating the land, collecting the rents, enclosing the land, making improvements, selling timber, paying the t..xes, for a long numbers of years, at least covering the period required by statute of seven years, or by prescription of twenty years, with the full knowledge of the co-tenants, and no settlement made or requested for rents and profits, the co-tenants not being under any legal disability, and with full notice and knowledge upon the part of the co-tenants of such adverse holding and claim by the tenant in possession, would consistute an actual ouster.

Appeal from Chancery Court, Lauderdale County; Hon. V. H. Holmes, Chancellor.

Affirmed.

Steele and Steele and Craig and Bullock, all of Ripley, for appellant.

R. O. Valley and J. W. Canada, of Memphis, for appellee.

SENTER, J. The original bill in this cause was filed in the chancery court of Lauderdale county, Tennessee, on March 21, 1925, by Mrs. Minola Lambuth Valley and husband, Raymond O. Valley, and James Lambuth, by his regular guardian, Mrs. O. L. Sanders, against W. E. Lambuth, then a resident of New Mexico. In the original bill complainants alleged that Mrs. Minola Lambuth Valley and James Lambuth were each entitled to a one-sixteenth undivided interest in a tract of land containing 1240 acres, situated in Lauderdale county, Tennessee. The original bill sought attachment of the property and also an accounting for rents and profits against W. E. Lambuth. It also alleged that Mrs. Minola Lambuth Valley, was twenty-two (22) years old at the time the suit was commenced, and James Lambuth was a minor eighteen (18) years of age and who was suing by his regular guardian, Mrs. O. L. Sanders; that complainants, Mrs. Minola Lambuth Valley and James Lambuth, were the children and heirs at law of Walter Lambuth, deceased, and that Walter Lambuth was the son of J. T. Lambuth, who

died intestate, leaving as his heirs two children, Walter Lambuth and Lula Lambuth Price; that Walter Lambuth died intestate leaving as his only heirs at law the complainant, Mrs. Minola Lambuth Valley and James Lambuth.

It is alleged in the bill that defendant Walter Lambuth and W. E. Lambuth were tenants in common in the 1240 acre tract of land involved in this suit; that W. E. Lambuth and Warner Lambuth purchased this property from John W. Duncan and wife by deed dated September 10, 1888; that Warner Lambuth died without having married and without leaving bodily heirs, and leaving as his only heirs at law his two brothers, W. E. Lambuth and James T. Lambuth; that James T. Lambuth, as one of the heirs at law of Warner Lambuth, inherited a one-fourth undivided interest in said tract of land from his brother, Warner Lambuth; that James T. Lambuth died intestate leaving as his children and only heirs at law Walter Lambuth and Lula Lambuth Price, and that Walter Lambuth, as one of the children and heirs at law of J. T. Lambuth, inherited a one-eighth share in said 1240 acre tract of land, and that complainants, Mrs. Minola Lambuth Valley and James E. Lambuth, as the only children and heirs at law of Walter Lambuth, deceased, inherited each a one-sixteenth undivided interest in said property.

W. E. Lambuth filed an answer to said original bill on the 27th day of April, 1925, and made his answer a cross-bill to the original bill, and in which he denied that the complainants or either of them were entitled to any interest in the land in question. In the answer and cross-bill it was alleged that the complainants, Mrs. Minola Valley and James Lambuth were not legal heirs at law of Warner or J. T. Lambuth. It was further alleged that Walter Lambuth, the father of Mrs. Valley and James Lambuth, was not the legitimate child of J. T. Lambuth and would not have any inheritable interest in the estate or property of James T. Lambuth. It was further alleged in the answer and cross-bill that while the title to this property by the deed of Duncan was vested in W. E. and Walter Lambuth, that cross-complainants, W. E. Lambuth had paid all the purchase money for said property, including the cash payment of two thousand dollars ($2,000) and the deferred payment notes, in all sixteen thousand dollars ($16,000) and that Warner Lambuth had never paid any part of the purchase price for said property. It was further alleged in the cross-bill that W. E. Lambuth had held said property from the date of its purchase, September, 1888, to the date of the filing of the original bill in this cause, openly, notoriously, continuously, uninterruptedly and adversely against the world; that he had at all times since the purchase of said property managed the property, cultivated the property, rented the property,

collected the rents from the property and openly claimed to be the sole owner of the property, and in the undisputed adverse possession of the property, and that James T. Lambuth, the brother of Warner Lambuth and W. E. Lambuth, well knew of this claim to the property by W. E. Lambuth, and had actual notice for many years that W. E. Lambuth was claiming to be the sole owner of said property, and during all of which time never asserted any interest or right in said property, but conceded the ownership of said property in said W. E. Lambuth, and that Warner Lambuth never at any time claimed any interest in said property and had actual knowledge and notice of the fact that W. E. Lambuth was claiming to be the sole owner of said property and that said Warner Lambuth never at any time asserted any claim of right to any interest in said property, and that these facts constituted an actual ouster of J. T. and Warner Lambuth to any interest in said property.

In said answer and cross-bill, cross-complainants sought affirmative relief against the complainants. First, damages for the wrongful issuance of the attachment on the property, and secondly, that the claim of complainants was a cloud upon the title of defendant, W. E. Lambuth, and that W. E. Lambuth was entitled to recover against the attachment bond damages resulting from the wrongful issuance and levying of the said attachment, and second to have the title of W. E. Lambuth in said property quieted and the claim or interest in said property by cross-defendants removed as a cloud upon the title of W. E. Lambuth.

Cross-defendants filed an answer to the cross-bill on May 26, 1925, and in which answer the material averments and allegations in the cross-bill were denied.

The pleadings in the cause present two questions of law and fact. First, the legitimacy and inheritable blood of Walter Lambuth in real property located in the State of Tennessee, and second, the question of adverse possession and ouster by W. E. Lambuth from any right, claim or title of Warner Lambuth, J. T. Lambuth and Walter Lambuth.

Warner Lambuth died in Gold Dust, in Lauderdale county, Tennessee, on August 23, 1889, leaving as his only heirs at law his two brothers, cross-complainant W. E. Lambuth and James T. Lambuth, deceased, James T. Lambuth died on February 23, 1901; at the time of his death James T. Lambuth was a resident of the State of Arkansas, where he had lived for many years.

At the conclusion of all the evidence the chancellor, of his own motion, excused and discharged the jury for the reason that there were no material issues of fact to be submitted to the jury, and rendered a decree in the cause, sustaining the cross-bill of cross-

complainants, and decreeing that the claim of cross-defendants, Mrs. Minola Lambuth Valley and James Lambuth to any interest in the land constituted a cloud upon the title of cross-complainant W. E. Lambuth, and removing the same, and thereby quieting the title of W. E. Lambuth in said property and divesting all claim of title that cross-defendants may have had in said property and vesting the same in W. E. Lambuth.

The decree of the chancellor is predicated upon two propositions of law and fact. First, that Walter Lambuth, the father of cross-defendants, Minola Lambuth Valley and James Lambuth, was born in Tennessee out of lawful wedlock and never was legitimated by the laws of Tennessee, and that no legitimation under the laws of the State of Arkansas would entitle him to inherit any interest in the lands involved in this cause. Second, that from the uncontroverted facts in the case that since the death of Warner Lambuth on August 23, 1889, the cross-complainant W. E. Lambuth has been in the exclusive possession and control of said tract of land under said deed and by inheritance from Warner Lambuth, claiming it as his own, and exercising such open, notorious, continuous, exclusive and adverse possession thereof under enclosure as would amount to an ouster of any other tenant in common, if there were any, and bar any right they might have in said lands, by said exclusive and adverse holding, and particularly by holding and retaining the lands and profits therefrom, managing and controlling said place, paying taxes thereon, making improvements thereon and making conveyances of parts of the same, and selling timber therefrom, and retaining the profits of said sale and giving actual notice of the adverse claim of title, and to the exclusion of the claim of any co-tenants thereto, and with the full knowledge of James T. Lambuth from the death of Warner Lambuth, and with the full knowledge of the said Walter Lambuth from the death of the said James T. Lambuth; that the said exclusive, continuous, adverse possession continued from the death of Worner Lambuth for more than seven years until the death of the said James T. Lambuth, in February, 1901, and after the death of the said James T. Lambuth continued under said deed and by inheritance for more than seven years and until the death of Walter Lambuth in October, 1908, and has so continued from said time until the bringing of this suit for more than seven years and more than thirty years from the making and recording of said deed, and barring the right of any other party therein.

Cross-defendants excepted to the action of the court in so decreeing, and moved the court for a new trial, assigning grounds therefor, which motion for a new trial was overruled and disallowed by the court, and to which action of the court the cross-defendants

excepted and prayed an appeal to this court and have assigned errors.

The first assignment of error was to the action of the court in overruling and disallowing cross-defendants plea to the jurisdiction of the chancery court of Lauderdale county, Tennessee, to proceed with the trial of the cause after the original bill had been dismissed on motion of original complainants, and a suit involving the same issues of law and fact, and for the same purposes was subsequently filed in the United States District Court at Memphis. It appears from the record that at the time the original suit was dismissed on motion of original complainants an order of reference was made by the chancellor to the clerk and master on the question of damages sustained by defendant W. E. Lambuth for the wrongful issuance and levying of the attachment in the cause. The defendant to the original bill filed his answer and cross-bill in this cause on April 27, 1925, and process was duly served on cross-defendants, Minola Lambuth Valley and James Lambuth and Mrs. O. L. Sanders, guardian of James Lambuth, requiring them to appear on the first Monday in May, 1925, and answer the cross-bill. On May 5, 1925, the original complainants filed their petition in the chancery court of Lauderdale county, Tennessee, to remove the cause to the Federal court at Memphis, Tennessee. On May 19, 1925, while the cause was being heard on the petition to remove to the Federal court, the complainants moved to be allowed to dismiss their original bill and attachment levied on the land. The motion to dismiss the original bill was allowed and the original bill was dismissed, but an order of reference was made to the clerk and master to ascertain the damages for the wrongful suing out of the attachment. Whereupon, on the same day the complainants dismissed their petition for removal of the cause to the Federal court, and were allowed until May 25th in which to file their answer to the cross-bill. On May 25, 1925, the cross-defendants filed their plea to the jurisdiction of the chancery court, denying that the chancery court of Lauderdale county had jurisdiction of the subject-matter involved in the cross-bill, because of the fact of the filing of the suit in Federal court at Memphis, on March 30, 1925. This plea to the jurisdiction was overruled. Whereupon, cross-defendants were permitted to file an answer to the cross-bill on May 26, 1925.

This cause was pending in the chancery court on the original bill filed by the same complainants who later filed a bill in the Federal court and the jurisdiction of the chancery court of Lauderdale county, Tennessee, had been invoked by the original complainants in a suit involving the same questions and for the same purposes that were involved in the cause in the Federal court. A petition

to remove the cause to the Federal court was filed by the original complainants on May 5, 1925. On May 19th, while the cause was being heard on the petition to remove to the Federal court, the original complainants made the motion to be allowed to dismiss their original bill and attachment, and at the same time original complainants dismissed their petition to remove the cause to the Federal court and were allowed until May 25th in which to file answers to the cross-bill, and on May 25th the plea to the jurisdiction was filed.

It will be noted that the dismissal of the original bill occurred on May 19th, while the answer and cross-bill of cross-complainants was filed on April 27th. The cross-bill sought certain specific affirmative relief. The dismissal of the original bill after the filing of the cross-bill did not operate to dismiss the entire proceedings, but the cross-bill remained and the issues presented in the cross-bill were within the jurisdiction of the chancery court of Lauderdale county, Tennessee, as well as the subject-matter of the litigation.

In this aspect of the pleadings it is clear that the dismissal of the original bill on May 19th would not operate to take the cross-bill out of court. The suit was then pending in the chancery court for the determination of the issues tendered by the cross-bill, since the cross-complainant was seeking affirmative rights and relief against the original complainants incident to and growing out of the same subject-matter embraced in the original bill.

It is insisted by cross-defendants that the suit now pending in the United States District Court in Memphis, Tennessee, is an action in rem, brought for the purpose of setting up certain interests in real estate located in Tennessee, and removing a cloud from the title of the same, and to partition the same and for an accounting for rents and profits on the same, and a lien on said land for rents and profits.

It will be noted that the suit filed in the chancery court of Lauderdale county was for the same exact purpose, and the same parties to the suit, and filed by the same complainants who afterwards filed the suit in the Federal court without first dismissing the suit in the chancery court of Lauderdale county, Tennessee. The filing of the suit in the Federal court did not operate as a dismissal of the cause filed for the same purpose then pending in the chancery court of Lauderdale county.

A cross-bill had been filed by cross-complainants to the original bill before the dismissal of the original bill filed in Lauderdale county, Tennessee. The cause was still retained in the chancery court on an order of reference made by the chancellor to the clerk and master on the matter of damages alleged by cross-complainants

for the wrongful suing out and levying of the attachment on the land involved in the cause. It will thus be seen that the chancery court of Lauderdale county had first acquired jurisdiction of the cause and subject matter.

The dismissal of the original bill in the chancery court of Lauderdale county did not operate to dismiss the cross-bill, and the chancery court of Lauderdale county having first acquired jurisdiction, and then having the jurisdiction of the parties and the subject-matter of the litigation, the proceedings in the chancery court of Lauderdale county were clearly within the jurisdiction of that court. Simpkins, Federal Practice, 678.

The case of Covell v. Heyman, 111 U. S., recited and relied upon by cross-defendants in support of the contention that the chancery court of Lauderdale county did not have jurisdiction of the subject-matter involved, does not present the question of the jurisdiction of the chancery court to retain a cause then pending in the chancery court of the State. The United States Supreme Court in Covell v. Heyman, states as follows:

"The sole consideration presented for our decision is, whether it was error in the State court to permit a recovery of the possession of property, thus held, against the marshal of the United States or his deputy, for the rightful owner; and whether, on the other hand, it should not have been adjudged in favor of the defendant below, that his possession of property by virtue of the levy of the writ was, in itself, a complete defense to the action of replevin without regard to the rightful ownership."

It will be observed that in the case of Covell v. Heyman, supra, the defendant in error was the plaintiff in the State court and brought her action of replevin for the recovery of specific personal property, to which she claimed title and which, she alleged, was wrongfully detained by the plaintiff in error.

The defendant below in that case was deputy marshal of the United States, and, as such, had possession of the property replevied by virtue of an execution issued upon a judgment of a circuit court of the United States from the Western District of Michigan against Adolph Heyman, having taken the same by virtue of a levy under said execution, as the property of the judgment debtor. Judgment was rendered in the Supreme Court of the State for the complainant below upon her title to the property, reversing judgment for the defendant below in the circuit court for the county of Kent. To reverse that judgment the writ of error was prosecuted in the Supreme Court of the United States.

It will thus be seen that in that case the property was already in custodia legis in the Federal court at the time the suit was brought in a State court to replevin the property from a United States Marshal who was holding the same under an execution issued from the Federal court and levied by the Deputy United States Marshal on the property.

Cross-defendants cite other cases and authority in support of their assignments of error going to the action of the chancellor in overruling and disallowing their plea to the jurisdiction of the chancery court of Lauderdale county. The cases cited and authority relied upon are not analogous to the case at bar. But it seems to be the well-settled rule that where a State court had jurisdiction of the subject-matter and the cause is still pending in the State court that the jurisdiction remains within the State court pending the final adjudication of the issues involved. Simpkins, Federal Practice, 678.

In State v. McClure, 47 L. R. A. (New Series), 762, the court say:

"It is a fundamental rule of law, subject to some exceptions to be hereinafter noticed, that, as between courts of competent jurisdiction, the first acquiring jurisdiction of the subject-matter of an action is permitted to retain it to the end."

We think this assignment of error is not well taken, and is accordingly overruled.

The second assignment of error goes to the action of the court in overruling and disallowing the application of cross-defendants for a continuance. The question of allowing or disallowing an application for a continuance addresses itself to the sound discretion of the chancellor. Upon an examination of the record and the status of the cause at the time the application for a continuance was made, we do not find that there was any abuse of this discretionary power upon the part of the chancellor. We do not think this assignment of error is well taken, and is accordingly overruled.

We now come to the consideration of the other assignments of error which go more directly to the merits of the cause. The cross-defendants sought to introduce a certified copy of the record from the chancery court of Crittenden county, Arkansas, in which the legitimacy of Walter Lambuth, as the natural son of James T. Lambuth and Amanda Lambuth, was alleged to have been adjudicated. We do not think that this record was competent as evidence in this cause, and the same was properly excluded by the court. The cross-defendants insisted that the certified record of proceedings in the chancery court in Crittenden county, Arkansas, in another suit and to other lands and other parties to the cause, operated as res adjudicata of the question of the legitimation of

Walter Lambuth under the Arkansas Statute. We are of the opinion that the chancellor properly held that the certified record in the cause was not competent, and that said proceedings in the chancery court of Crittenden county, Arkansas, could not operate as res adjudicata in this cause.

In order to plead res adjudicata to a pending suit it must appear that the former judgment relied upon as res adjudicata, or estoppel by judgment, are of the same parties and the same subject-matter as well as final judgment. Gibson's Suit in Chancery, sec. 329, pp. 269-270.

It is also required that the same evidence in both cases would sustain both judgments. State v. West, 139, Tenn., 529, 15 R. C. L., pp. 954-964.

The Arkansas Statute on the subject of legitimation of children born to parents who afterwards married is in the following language:

> "If a man have by a woman a child, or children, and afterwards shall intermarry with her and shall recognize such children to be his, they shall be admitted and considered as legitimate."

Sec. 3474—Arkansas Code.

The Tennessee Statute with reference to legitimating children not born in lawful wedlock is as follows: Shannon's Code.

> "Sec. 5406 (3644) 4385. Application to legitimate. The application to legitimate a child not born in lawful wedlock is made by petition, in writing, signed by the person wishing to legitimate such child, and setting forth the reasons therefor. (1805, ch. 2, sec. 2).
>
> 5407 (3641) 4386. Judgment.—The court, if satisfied with the reasons, may, by order embodying the petition in full, and entered upon the minutes of the court, declare such child legitimate. (Ib.)
>
> 5408 (3462) 4387. Effect.—The effect of the legitimation is to create the relation of parent and child between the petitioner and person legitimated, as if the latter had been born to the former in lawful wedlock."

We think it is well settled in this State, both on principle as well as under the law of comity between States, that a person having inheritable blood in another State of the Union is entitled to inherit under the law of descent in this State, Tenn., especially where there is no conflict in the law of descent.

This proposition seems to be well settled in the case of Finlay v. Brown, 122 Tenn.

"There is no doubt whatever, under the authorities in this country, that a child, who, in a foreign state in which both it and the adopted father are domiciled, has acquired under the laws of that State, the status of a child by adoption, must under the comity of states, receive recognition of its status as a child in every other state having substantially similar adoption laws and must be held capable of succeeding to real property in accordance with the laws of the State where the property lies, as adopted children are capable of inheriting under the local law of the State." Finlay v. Brown, 122 Tenn., citing Ross v. Ross, 129 Mass., 246, 37 Am. Rep., 321.

Mr. Chief Justice Neil, in Finlay v. Brown, supra, gives certain excerpts, and in which he states the leading case on the subject is Ross v. Ross, 129 Mass., where it is said:

"It is a general principle that the status of condition of a person, the relation in which he stands to another person, and by which he is qualified or made capable to take certain rights in that other's property, is fixed by the laws of domicile, and that this status and capacity are to be recognized and up-held in every other state, so far as they are not inconsistent with its own laws and policy. Subject to this limitation upon the death of any man, the status of those who claim succession, or inheritance in his estate is to be ascertained by the law under which that status was acquired. . . .

Inheritance is governed by the lex rei sitae; but legitimacy is to be ascertained by the lex domicilii. If a man domiciled in England has two legitimate sons there and dies intestate, owning land in this commonwealth, both the sons have the status of legitimate sons here; but by virtue of our statute of descent the land descends to them equally and not to the eldest son alone, as by the law of England."

In Finlay v. Brown, supra, it is further stated:

"The recognition of the status acquired by adoption, when confined as above indicated, cannot be held as a breach of the policy of that State in which the land lies, where such State has no law of adoption; nor can it be held a violation of the statutes of descent."

The statute in Tennessee makes provision for the legitimation of children not born in lawful wedlock, and the execution of the legitimation to create the relation of parent and child between the parents and person legitimated, as if the child had been born to the former in lawful wedlock.

The only distinction between the Arkansas Statute and the Tennessee Statute on this subject is in the matter of procedure. The natural children born out of lawful wedlock to parents may be legitimated in either State, under the Statute Law of the respective states, and when so legitimated, these children are entitled to inherit under the law of descent in both States, and have the same status as children born in lawful wedlock.

In Finlay v. Brown, supra, the Supreme Court of Tennessee, further discussing this subject, states:-

"It is insisted that recognition of a foreign adoption will tend to make land titles uncertain in this State, since it may happen, after titles have seemed to vest here in persons apparently heirs at law, and these lands may have been sold by such persons to other persons, a foreign adoption may be discovered and great confusion and loss ensue. The same results might follow on the discovery of a child born of a marriage in a foreign State not previously known here. There is nothing in the authorities to indicate that any practical inconvenience has arisen from either of these sources.

It is insisted that by recognizing a foreign adoption the law of this State would be subordinated to the laws of another State. There is nothing in this view, because this State will not, by comity, recognize the laws of any other State opposed to our own institutions or policy. We have already shown that there is no conflict between adoption laws and the statutes of descent.

There is another class of cases closely assimilated to those arising under heirship by adoption. These cases depend upon the principle that when an illegitimate child, has, by the subsequent marriage of its parents, become legitimated by virtue of the laws of the State of country where such marriage took place, and the parents were domiciled, it is thereafter legitimate everywhere, and entitled to all the rights flowing from that status, including the right to inherit." Citing Miller v. Miller, 91 N. Y., 315, 43 Am. Rep., 669; Dayton v. Adkisson, 45 N. J. Eq., 603, 17 Atl., 964, 4 L. R. A., 488, 14 Am. St. Rep., 763; Smith v. Kelley, 23 Miss., 167, 55 Am Dec., 87; Scott v. Key, 11 La. Ann., 232. And see 3 Am. and Eng. Enc. of Law, p. 897; Story on Conflict of Laws, p. 173.

Cross-complainants in this cause in their excellent brief, seek to distinguish the instant case from the case of Finlay v. Brown, supra, and relies upon the latter case of Cole v. Taylor, involving the case of colored children born to parents married under the slave mar-

riages. In that case Mr. Justice Fancher delivered the opinion of the court in which it is stated that Tom Pollard and Alice Cole were children of Jordon Pollard and wife, Frances Pollard, all of whom were persons of color, and were slaves prior to the emancipation. Jordon and Frances Pollard were married in accordance with the custom of slave marriages in the State of Georgia, before the Civil War. They lived together as husband and wife until the death of Jordon. It is further stated in that case that Alice Cole is the sole survivor of the family, all of their brothers and sisters having died without issue. During the Civil War the family moved from Georgia to Alabama, from whence they returned after the close of the War to Georgia. Soon after the Civil War either by constitutional or statutory enactment provisions were made by the States of Georgia, Alabama, Mississippi, Tennessee, and other southern states, establishing the status of negroes under slave marriages.

In that case it was insisted that, by the laws of either Georgia, Alabama, or Mississippi, the slave marriage of Jordon Pollard and Frances Pollard was made valid, and their children legitimated to all intents and purposes; that said Tom and Alice, being legitimated under the laws of one or the other of these States, they were legitimate here, and, being so, the said Alice may inherit from her brother, Tom. The chancellor rendered a decree in accordance with this position and permitted a recovery by the complainant.

The Tennessee Statute on this subject limits the right of children born to a slave marriage to the right of inheritance only to the lineal descendants of parents. In Cole v. Taylor, supra, it is stated:

"The Statute of Tennessee on this subject has been before the court a number of times. This act declared that slaves who, within the State, had lived together as man and wife should be regarded as lawfully married, and that the children of such slave marriages should be legitimately entitled to an inheritance in any property heretofore acquired or that may be hereafter acquired by such parents to as full an extent as the children of white citizens are entitled by the laws of this State. This statute was properly construed as not extending any rights of inheritance beyond the lineal descendants of parents." Citing Sheperd v. Carlin, 99 Tenn., 64; Carvell v. Maxwell, 110 Tenn., 75.

In the case of Cole v. Taylor, supra, the question presented there was whether or not children born to a slave marriage, even under the laws of another State and by which laws of such other State such children were given the status of children born in lawful wedlock, and as such entitled to inherit as children born in lawful

wedlock, could therefore inherit under the laws of Tennessee. In that case the Supreme Court stated as follows:

> "Our Tennessee law upon the subject, now firmly established by judicial construction, limits its own citizens occupying this same relationship born in slavery under slave marriage to direct inheritance from the parents." Sheperd v. Carlin, supra.

It is further stated in the opinion in Cole v. Taylor:

> "The court is asked in this case, on grounds of comity between the States, to adopt the laws of either Georgia, Alabama, or Mississippi, and to grant to ex-slaves coming from one or the other of these states a right of collateral inheritance which the Legislature of our own State has refused to persons born of slave marriages in the State of Tennessee."

It will thus be seen that under the law of the State of Tennessee the right of inheritance by children born to slave marriage was specifically limited to the right to inherit only from the parents, and the laws of the other States mentioned contained no such limitation and hence were in conflict and inconsistent with the Tennessee law as applied to children born to slave marriages.

The case of Finlay v. Brown, 122 Tenn., is distinguished from the case of Cole v. Taylor, 132 Tenn., In Cole v. Taylor, referring to the opinion of the Supreme Court in Finlay v. Brown, the court say:

> "The opinion of this court in Finlay v. Brown, 122 Tenn. (14 Cates), 335, 125 S. W., 259, 25 L. R. A. (N. S.), 1285 (Chief Justice Neil), recognizes the authority of cases holding in favor of recognition by one State of legitimation by subsequent marriage of parents by virtue of the laws of the State or country where the marriage took place, as against opinions holding the contrary. But that case was not one where the recognition of the laws of another State or country conflicted in policy with that of our Tennessee laws on the subject. In that opinion it was recognized that this State will not by comity adopt the laws of another State opposed to our own institutions or policy. . . .
>
> It therefore follows that while, as a general proposition, legitimacy attaching in one jurisdiction follows the person wherever he may go; yet this rule is qualified to the extent that it must yield to the policy of the State of his adoption, so far as the right of inheritance is concerned. The unquestioned right of a State to prescribe the manner in which real estate within its boundary may descend must not be lost sight of."

We are of the opinion that if Walter Lambuth was shown to be, by the proof, the illegitimate son born out of lawful wedlock to Amanda Conn and James T. Lambuth, who afterwards intermarried, and were domiciled in the State of Arkansas, said Walter Lambuth became legitimated under the law of the State of Arkansas, and therefore had the status and inheritable blood of a legitimate child and therefore had the status and inheritable blood of a legitimate child and heir at law of his father, James T. Lambuth.

The pleadings in this case present the issue that Walter Lambuth was not the natural son of James T. Lambuth, but was, in fact, the illegitimate son of one Charlie Krause or Charlie Cruze.

Cross-complainants allege that during the yellow fever epidemic in Memphis, in 1878 and 1879, Amanda Conn was living in Memphis in the old Gayoso Hotel with a man by the name of Charlie Krause or Cruze, who died in the room of Amanda Conn with yellow fever in 1879; that Amanda Conn had an illegitimate child born there in Memphis in May, 1879, who went by the name, thereafter, of Walter Lambuth, but was the child of the said Charlie Krause or Cruze; that she fled with this child from Memphis and went to Paducah, Ky., where she lived in a house with a Mr. and Mrs. Owen, when the child was two or three months old. Thereafter, she went back to Memphis. That in 1883, James T. Lambuth took up with and began living with Amanda Conn without being married to her, and to them was born one child in 1884, named Lula Lambuth. They lived together in Memphis in this way and without being married, until on February 6, 1893, they were legally married in Somerville, Fayette county, Tennessee, and went back to Memphis, where they lived as man and wife with the two children, Walter and Lula, for about eight months, when they moved up to Lambuthville, Arkansas. These averments in the cross-bill are denied by cross-defendants in their answers.

It appears from the record that the three Lambuth brothers, W. E., Warner and James T., were engaged in a joint enterprise operating a boat and saw mill for several years, on the Ohio and Mississippi rivers. This saw mill seems to have been a floating mill on a boat and operating up and down the Ohio and Mississippi rivers, beginning operations near Western Kentucky on the Ohio River and it was at this place that these three brothers met Amanda Conn. This was some years prior to 1878. In the spring of 1878 these brothers were engaged in operating the saw mill business on the Mississippi River about ninety miles north of Memphis. During Mardi Gras in February, 1878, James T. Lambuth left the boat and went to Memphis for a day and night. It appears this was the only time he was off the boat and away from his brother, W. E. Lam-

buth, during the years of 1878 and 1879. And the only time that he had access to Amanda Conn was on this visit to Memphis in February of 1878, if at all. He did not return to Memphis again until 1883, where he lived until the summer of 1893, and moved from there up to Lambuthville, Arkansas.

It appears that neither of these three brothers had seen Amanda Conn from 1876 until their return to Memphis in 1883, unless James T. Lambuth saw her in Memphis on the occasion of his visit during Mardi Gras in February of 1878. There is no proof in the record that he did see Amanda Conn on that visit, but that it was the only time that he could have seen Amanda Conn from 1876 until 1883.

It appears that Amanda Conn was living in Memphis at the time of the visit of James T. Lambuth in February of 1878, but there is no proof in the record that he saw her on that visit.

It appears that an illegitimate son was born to Amanda Conn in May, 1879, and that this illegitimate son, named Walter, became later known as Walter Lambuth. It was not until 1883 that James T. Lambuth began living with Amanda Conn, and in 1884 the child, Lula, was born. It seems to be conceded that the child, Lula, was the daughter of James T. Lambuth and Amanda Conn, born out of wedlock. This illegitimate relationship continued between James T. Lambuth and Amanda Conn until 1893, when they were legally married in Fayette county, Tennessee. The above facts appear from the evidence of W. E. Lambuth, Mrs. Kate Owen and Mrs. Lula Price, witnesses for cross-complainants.

W. E. Lambuth states in his evidence on pages 118 to 122, that he knew Amanda Conn, the woman his brother, James T. Lambuth afterwards married; that during the years 1878 and 1879 she was not on the boat operated by himself and two brothers, Warner and James T.; that during that time his brother was not off of the boat but one time; that in February, 1878, his brother, James T. Lambuth, with one Ham Granger, went to Memphis to attend Mardi Gras and was there one day and night. That with that exception his brother, James T. Lambuth, was never off of the boat during the years 1878 and 1879, and during that time Amanda Conn was never on the boat or with James T. Lambuth.

The same witness states that in 1883 that he next saw Amanda Conn, who was then living in Memphis and that she then had one child, who she stated she had named Walter Lambuth; that this child appeared to be three or four years of age at that time. The same witness stated that it was not until 1893 that his brother, James T. Lambuth, married Amanda Conn in Fayette county, Tennessee, and that they lived in Memphis for a short time after they married and then went up to Lambuthville, Arkansas, about eighty miles north of Memphis, to live. The same witness stated that the child, Lula, was born to Amanda Conn while his brother, James T. Lam-

buth, was living with her and before they were married in 1893. The same witness stated that Amanda Conn told him that the father of the child, Walter, was Charlie Krause or Cruze; that she never made any claim to the witness that his brother, James T. Lambuth, was the father of the child, Walter, but told him that the father of the child, Walter, was Charlie Krause or Cruze.

The witness for cross-complainants, Mrs. Kate Owen, stated that she lived in Paducah, Ky., and was the wife of W. M. Owen; that she had lived in Paducah, Ky., practically all her life with the exception of a few years spent in Memphis; that she lived in Memphis in the years 1891 and 92. She stated that she knew James T. Lambuth and Walter Lambuth; that she also knew Amanda Conn; that the Lambuth boat was at Paducah, Ky., in 1879. She stated that Amanda Conn came to Paducah, Ky., in 1879; that Amanda Conn then had with her a child named Walter, who at that time appeared to be two or three months old; that Amanda Conn came to Paducah from Memphis she thought about February, 1879, with the child Walter. This witness stated that Amanda Conn told her while she was living in the house with her at Paducah, in 1879, that Charlie Krause or Cruze was the father of the child, and that Charlie Krause or Cruze was living with her in a room in the old Gayoso Hotel in Memphis where he died. The witness also stated that James T. Lambuth told her that Walter was not a Lambuth.

This witness further stated as to why Amanda Conn told her that Charlie Krause was the father of the child, that they occupied the same house, that Amanda Conn occupied the upstairs portion of the house, and that the witness and her husband occupied the lower part of the house; that Amanda Conn then had two children with her, and that both these children became sick and that Walter came near dying, and that out of sympathy for her she helped to nurse the children, that they were strangers to her and that she asked Amanda Conn where her husband was, and that Amanda Conn then broke down and cried and told her all of this; that she did not have a husband; that Charlie Krause had been living with her in Memphis and had died in the room occupied by them in Memphis and that they had destroyed all of their things and gotten away from there on account of the yellow fever, and that she came to Paducah with these two children.

It is clear that when she refers to Amanda Conn having with her two children that the other child afterwards died and was perhaps the illegitimate child of Walter Lambuth, who had known Amanda Conn about 1876 and which child afterwards died.

Mrs. Lula Price, witness for cross-complainants, was the illegitimate child of James T. Lambuth, and Amanda Conn. She stated in substance that she was born in the year 1884 in Memphis and about nine years later she moved from Memphis with her father and moth-

er to the farm at Lambuthville, Arkansas; that her father died February 23, 1901; that her mother died in the year 1915; that her mother lived with the witness after the witness had married. She stated that Walter Lambuth was her half brother; that his mother was her mother. She stated that her mother told her that the father of Walter Lambuth was Charlie Krause, who died in Memphis in 1879 with yellow fever. She stated the reason why her mother told her who was the father of Walter was that, about eight months before her death she made a will, and after making the will she told her why she was making the will, and it was in this connection that she told her that Charlie Krause was the father of Walter.

She also stated that on another occasion she heard her mother make the statement to a Mrs. Hunt, a music teacher and friend of the family, that Charlie Krause was the father of Walter Lambuth.

The same witness, on cross-examination, stated that Walter Lambuth was known as her half-brother. There was no material evidence in the record that Walter Lambuth was the natural son of James T. Lambuth.

It appears from the evidence in the cause that James T. Lambuth, after he began living with Amanda Conn supported the child, Walter, and that after he married Amanda Conn the child, Walter, continued to live with them as a member of the family and was sent to school by James T. Lambuth.

It appears that the cross-defendants relied solely on the certified record from the chancery court of Crittenden county, Arkansas, and the findings of fact by the chancellor as set out in the transcript of that record to prove the fact that Walter Lambuth was the natural son of James T. Lambuth, and did not offer any independent proof to the fact that Walter Lambuth was the illegitimate son of James T. Lambuth. This record from the chancery court of Crittenden county, Arkansas, was properly excluded by the court for the reasons heretofore set forth in this opinion.

We do not think there was any material evidence offered at the trial of the case in the chancery court of Lauderdale county that tended to prove that Walter Lambuth was the son of James T. Lambuth. All the evidence offered in the cause was to the effect that Walter Lambuth was the illegitimate son of Charlie Krause or Cruze, except that after James T. Lambuth moved to Arkansas, after his marriage with Amanda Conn, he educated Walter and that Walter was living in the home and treated as a member of the family. Considering the former illegitimate relations prior to the marriage of James T. Lambuth to Amanda Conn, extending from 1883 until the marriage in 1893, and considering the further fact that Lula Lambuth was the illegitimate daughter of this couple, it would not be improbable that James T. Lambuth would take the same care of Walter Lambuth, the illegitimate son of Amanda Conn,

even though James T. Lambuth was not the father of this illegiti-
mate son.  We do not think there was any material or competent
evidence offered at the trial of the cause to support the insistence
of cross-defendants that Walter Lambuth was the son of James T.
Lambuth, which should have been submitted to the jury.

However, if it be conceded that this evidence should have been
submitted to the jury, the further question is presented by the
pleadings and the facts which we think is determinative of this
cause, and entitles an affirmance of the decree of the chancellor.
That is the question that cross-complainants had acquired title by
adverse possession and actual ouster.

If the record in this cause sustained the contention of cross-de-
fendants that Walter Lambuth had become the legitimated son of
James T. Lambuth, and therefore entitled to inherit a one-eighth
undivided interest in the tract of land in question, and cross-de-
fendants, as the children and only heirs at law of Walter Lambuth
were entitled to inherit a one-eighth undivided interest of their
father, James T. Lambuth, or a one-sixteenth undivided interest,
each, in this property, we are constrained to reach the conclusion
under this record that whatever claim or interest the cross-defend-
ants may have had in this property, it had become nonenforcible
because of the adverse possession of W. E. Lambuth and the actual
ouster by W. E. Lambuth of James T. Lambuth and Walter Lambuth.

While it is true that adverse possession of one tenant in common
without an actual ouster of the co-tenants would not operate to bar
the claim of co-tenants, even though all the elements of an edverse
holding are present.  It is well settled in this State that an actual
ouster must be clearly established in order to give effect to the Stat-
ute of Limitations in favor of one tenant in common against another.
Hubbard v. Wood, 1 Sneed, 279.

> "When a co-tenant claiming as such enters on the common
> land he is exercising a right which his title gives him; and
> his resulting possession is presumed to be consistent with his
> assumed title, and therefore could be the possession of his co-
> tenants and himself." 3 R. C. L., p. 844.

> "This proposition is based upon the supposition that the
> entry is made either eo nomine as tenant in common, or that
> it is silently made, without any particular avowal in regard
> to it, or without notice to a co-tenant that it was adverse. But
> the doctrine has been long since held, and the authorities sus-
> tain it, that one tenant in common may so enter and hold as to
> render the entry and possession adverse, and amount to an
> ouster of a co-tenant. . . . 3 R. C. L., p. 845.

As to what would amount to an actual ouster of co-tenants, coupled
with adverse possessions for the statutory period has been the sub-

ject of considerable dissention. The rule seems to be that the holding of a co-tenant, openly, notoriously, exclusively, and exercising all rights of ownership, by cultivating the land, collecting the rents, enclosing the land, making improvements, selling timber, paying the taxes, for a long number of years, at least covering the period required by statute of seven years, or by prescription of twenty years, with the full knowledge of the co-tenants, and no settlements made or requested for rents and profits, the co-tenants not being under any legal disability, and with full notice and knowledge upon the part of the co-tenants of such adverse holding and claim by the tenant in possession, would constitute an actual ouster.

In Marr v. Gilliam, 1 Cold., 489, it is stated:

"It is well settled that the exclusive and uninterrupted possession by one tenant in common of land for a great number of years—say for twenty years or more—claiming the same as his own, without any account with his co-tenants, or claim on their part, they being under no disability to assert their rights, becomes evidence of a title to such sole possession, and the jury are authorized to presume a release, an ouster, or other thing necessary to protect the possessor, and the action of ejectment by his co-tenants, in such case, is barred.

While it is true this creates but a presumption and this presumption may be rebutted . . ., the relation of the parties or other facts showing that the possession was not adverse to the owner, but by his permission or indulgence, or as his tenant . . . ."

"As between tenants in common, an ouster may be presumed in favor of one, who, with the knowledge of his co-tenants, and without objection takes and holds, for many years, exclusive and adverse possession of land held in common; receives all rents and profits thereof; and conveys the land to secure his debts and subsequently conveys it in fee simple to a purchaser who held it adversely for many years before suit was brought." Burns v. Headerick, 85 Tenn., 102.

In this case it appears that W. E. Lambuth contracted for the purchase of this property at the price of sixteen thousand dollars ($16,000), and before the purchase was consumated invited his brother, Warner Lambuth, to become a partner with him in the purchase of the property; accordingly the deed from Duncan and wife to this 1240 acre tract of land was executed, conveying the property to cross-complainant W. E. Lambuth and his brother Warner Lambuth. This conveyance was made on September 4, 1888.

It is clear from the record that W. E. Lambuth paid the entire purchase price for this property, and that Warner Lambuth did not pay any part of the same. Warner Lambuth died in August, 1889,

leaving surviving him as his only heirs at law, his two brothers, W. E. and James T. Lambuth.

It is also clear from the record, and the uncontroverted proof in the cause, that James T. Lambuth, during his lifetime never claimed any interest or share in this 1240 acre tract of land; that he well knew that his brother W. E. Lambuth was in the possession and control of this property during all those years, and claiming the same as his own, and exercising all rights of ownership over the property, and with full notice to James T. Lambuth that he was claiming the property as his own. James T. Lambuth never asserted any rights in the property; never requested an accounting for rents and profits; never denied the claim of W. E. Lambuth as being the sole owner, and never at any time objected or denied that W. E. Lambuth was the sole owner. James T. Lambuth died in 1901, more than seven years after the death of Warner Lambuth. Walter Lambuth, the father of cross-defendants, never made any claim to any interest in this property. He had knowledge of the fact that W. E. Lambuth was in possession of the property, renting it out, collecting the rents, selling the timber, and was not accounting to him, or to any one else for the rents and profits and sale of timber. Walter Lambuth died in 1908, seven years after James T. Lambuth died.

This, we think, constituted an actual ouster of James T. Lambuth and Walter Lambuth by adverse possession, and by actual notice of the adverse claim of W. E. Lambuth as the sole owner of the property. The chancellor took this view of the matter, and so decreed.

There was no material evidence offered at the trial of the cause controverting the adverse holding and ouster by W. E. Lambuth. Hence, there being no material evidence offered controverting the claim of cross-complainant, and the evidence of the witnesses sustaining the adverse holding and ouster of cross-complainant, there remained no question of fact on this subject to be submitted to the jury.

We are of the opinion that there was no error in the action of the chancellor in taking the case from the jury as the only questions involved were questions of law.

It results that the assignments of error are overruled and the decree of the chancellor is affirmed.

It is adjudged that cross-defendants and their sureties on the appeal bond will pay the costs of this appeal, and for which execution may issue.

Heiskell and Owen, JJ., concur.